UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

MICHAEL GRAY,

                Defendant.

REPORT & RECOMMENDATION

04-CR-6126L

---

**PRELIMINARY STATEMENT**

By Order of Hon. David G. Larimer, United States District Judge, dated August 23, 2004, all pre-trial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 2).

Defendant Michael Gray (hereinafter "Gray") is charged in a two-count indictment. The first count charges Gray with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). The second count charges Gray with possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). (Docket # 1).

Currently pending before this Court for a report and recommendation are Gray's motions to suppress statements.[1] (Docket # 20). An evidentiary hearing was held before this

---

[1] Gray's motions also sought, *inter alia*, discovery and inspection, *Brady* material, *Jencks* material, rulings on evidentiary matters under rules 404, 608 and 609 of the Federal Rules of Evidence and the preservation of rough notes. (Docket # 20). Each of these requests was either resolved by the parties or decided in open court by the undersigned on January 28, 2005. (Docket ## 25, 26).

Court on February 17, March 1, and March 24, 2005. (Docket ## 35, 37, 38). Sergeant Matthew McGrath and Deputy James Canfield of the Monroe County Sheriff's Department and Officers Jose Munoz and Angel Vazquez of the Rochester Police Department testified on behalf of the government. No witnesses were called on behalf of the defense. For the following reasons, it is the recommendation of this Court that Gray's motions be denied.

## FACTUAL BACKGROUND

On August 12, 2003, law enforcement executed a search warrant for Gray's residence at 334 Durnan Street. Before the search commenced, Deputy Canfield conducted an initial surveillance of the residence. At approximately 9:30 a.m., Canfield observed a black male exiting the front door. (Tr.B 7). He then notified Officer Munoz, who was waiting nearby in a marked patrol vehicle. Specifically, Canfield reported that a black male who fit the description of Gray had left the residence. Canfield proceeded to follow Gray as he walked down Durnan Street towards Carter Street. Once Gray reached the corner, Canfield informed Munoz of Gray's location and indicated that he was wearing a white tee-shirt, blue jeans and a brown baseball cap. (Tr.B 9; Tr.C 6-7).

After receiving Canfield's broadcast, Munoz drove to the corner of Durnan and Carter Streets and observed a male matching the description provided by Canfield. (Tr.C 7). As Munoz pulled his patrol car to the curb next to Gray, Gray fled. (Tr.C 8). Munoz followed him a short way in his car, then exited the car and ran after Gray. During the chase, at the northeast corner of 248 Roycroft Street, Munoz observed Gray drop a plastic bag that he believed

contained marijuana.[2]  (Tr.C 8-9, 13).  Munoz did not stop to recover the bag; rather, he continued to pursue Gray, eventually apprehending him at 252 Roycroft Street.  At no time during the chase did Munoz lose sight of Gray.

Once Gray was apprehended, Munoz placed him in the rear seat of Officer Vazquez's patrol car.  Because he had hurt himself during the chase, Munoz directed Vazquez to the northeast corner of the house at 248 Roycroft Street and instructed him to recover an "article" dropped by Gray.  (Tr.C 10; Tr.A 6-7).  Vazquez searched the specified area and discovered on the ground a sandwich bag containing smaller envelopes of marijuana.  (Tr.A 7).

Following the discovery, Munoz directed Vazquez to transport Gray to 334 Durnan Street.  (Tr.A 8).  Vazquez drove to that address, parked his car across the street and awaited further instruction.  (Tr.A 9).  As they waited, Vazquez attempted to obtain Gray's pedigree information by asking him for his name, date of birth, Social Security number and address, which Vazquez recorded in a Prisoner Data Report.  (Tr.A 9, 15).  After recording this information, and while Vazquez and Gray were still sitting in the patrol car, Vazquez observed officers exiting 334 Durnan Street with a rifle.  After Gray apparently saw the officers with the seized firearm, he uttered, "Damn, I just fucked up my girl."  (Tr.A 10-11).  Gray further stated to Vazquez that he had found the rifle in the garbage bin and that he had taken it into the house to keep if away from children.  (Tr.A 10).  No broadcasts had been received by Vazquez's police radio immediately prior to Gray's statements, and the windows in the patrol car were up.  (Tr.A 11).  After approximately an hour, Vazquez was directed to transport Gray to the Monroe County

---

[2] Officer Munoz originally testified that he observed Gray drop the bag of suspected marijuana at 248 Durnan Street.  During cross-examination, Munoz referred to the location as 248 Roycroft Street, which is consistent with the testimony offered by Officer Vazquez.  (Tr.C 8-9, 13).

3

Public Safety Building, which he did. (Tr.A 12). At no time did Vazquez advise Gray of his *Miranda* warnings. (Tr.A 20).

Gray was placed in an interview room at the Public Safety Building and, at approximately 12:00 p.m., Sergeant McGrath entered the room and introduced himself to Gray. (Tr.A 30). McGrath asked Gray for his name, level of education and whether he could read or write. (Tr.A 31-32). Gray indicated that he had an eleventh grade education and that he was able to read and write. (Tr.A 32, Government's Exhibit ("G.Ex.") 2). After he had obtained Gray's biographical information, McGrath advised Gray of his *Miranda* rights by reading the rights "one by one" from a *Miranda* card "exactly the way they're printed on the card." (Tr.A 32). McGrath then asked Gray whether he understood his rights, to which Gray responded, "Yeah, I understand everything." (Tr.A 32). McGrath further asked Gray whether he would like to speak with him. Gray replied, "Yes, I'll talk." (Tr.A 33).

McGrath questioned Gray for approximately twenty minutes about 334 Durnan Street, his involvement in selling marijuana, a rifle found at the location, and marijuana discovered on his person. (Tr.A 33). After their initial conversation, McGrath used the notes he had taken to draft a written statement, which paraphrased what Gray had told him. (Tr.A 34, G.Ex. 3). As he prepared the written statement, McGrath continued to speak with Gray to confirm that it accurately reflected Gray's statements. (Tr.A 34). Once the written statement was complete, McGrath read it aloud as Gray followed along. McGrath also asked Gray whether he wanted to make any additions or changes. Gray indicated that he did not, and he signed the statement. (Tr.A 36).

According to McGrath, the entire interview with Gray lasted approximately one hour and fifteen minutes. (Tr.A 37). Gray was "fairly talkative" and responsive to the questions posed to him. (Tr.A 37). He did not appear to be under the influence of drugs or alcohol, nor did he make any requests that were denied him. Finally, no threats or promises were made to induce Gray to speak. (Tr.A 38).

## REPORT AND RECOMMENDATION

Gray moves to suppress all statements made by him while in Officer Vazquez's patrol car, as well as all statements made during his interview by Sergeant McGrath. (Docket # 20). Gray's motion is based upon two independent grounds. First, Gray argues that his statements should be suppressed under *Wong Sun v. United States*, 371 U.S. 471 (1963). According to Gray, his arrest was unsupported by probable cause, and his subsequent statements thus should be suppressed as the fruit of that unlawful arrest. Second, Gray argues that suppression in also warranted because his statements were not preceded by *Miranda* warnings.

### I. Gray's Arrest

Gray argues that he was arrested without probable cause, and thus all of the statements he subsequently made should be suppressed as fruit of that unlawful arrest. *See Dunaway v. New York*, 442 U.S. 200 (1979) (requiring suppression of statements obtained as fruit of an unlawful arrest); *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (statements made following unlawful arrest suppressed as "fruit of the poisonous tree"). For the reasons discussed below, I disagree and recommend that the district court deny Gray's motion.

As an initial matter, I note that on the record before this Court as developed during the suppression hearing, I cannot determine that reasonable suspicion existed to stop Gray at the time Munoz first approached him. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). Munoz testified that his role on that day was to stand nearby as other officers waited for Gray to exit 334 Durnan Street and then, upon receiving word that he had, to stop him. (Tr.C 5-7). Munoz explained that he understood that Gray lived at 334 Durnan Street, a location for which a search warrant had been issued and was to be executed that day. (Tr.C 5). While acknowledging that he had been briefed of the investigation, he conceded that "all [he] kn[e]w is they had a search warrant for the location and they were looking for Mr. Gray, and he was probably involved in possession of a gun." (Tr.C 17).

Consistent with that role, Munoz received a radio call from Deputy Canfield, who was conducting surveillance of 334 Durnan Street, that a black male who was wearing a brown hat and a white tee-shirt, and who met the description of Gray, had been observed leaving that address and walking westbound on Durnan Street. (Tr.B 7-9, Tr.C 6). Canfield watched Gray leave the building at 334 Durnan Street and walk to the corner of Durnan and Carter Streets, where he observed Munoz approach Gray. (Tr.B 9). As both Canfield and Munoz testified, when Munoz approached Gray, Gray fled.[3]

At the time Gray fled, Munoz had not observed him engage in suspected illegal activity; rather, it was only after Gray ran that Munoz saw him discard a plastic bag to the

---

[3] Munoz testified that he did not believe that he had activated his siren or emergency lights when he approached Gray, or had verbally directed him to stop. (Tr.C 12-13).

ground. (Tr.C 8, 15, 17-18). After chasing Gray over a fence and into an area where other officers were located, Gray stopped running and was arrested. (Tr.C 16).

On this record, which is devoid of any explanation for the conclusory assertion that Gray "was probably involved in possession of a gun" (Tr.C 17), I find that the government has not established that reasonable suspicion existed to justify a stop of Gray at the time Munoz approached him. That finding, however, neither ends this Court's inquiry, nor mandates suppression of Gray's later statements. The reason it does not is because Gray, instead of stopping when Munoz pulled his car alongside of him, ran.

The legal issue presented by this factual record is strikingly similar to the one addressed less than one month ago in *United States v. Swindle*, 407 F.3d 562 (2d Cir. 2005). There, as here, the court confronted the question of whether an attempted stop by law enforcement – if it does not in fact succeed in stopping the target – implicates the Fourth Amendment. The Second Circuit, albeit reluctantly, concluded that it does not, relying upon the Supreme Court's earlier decision in *California v. Hodari D.*, 499 U.S. 621 (1991). *Id*. at 572-73.

In *Swindle*, law enforcement officers attempted to conduct a *Terry* stop of the defendant who was driving a car by activating the emergency lights on their patrol cars and ordering the defendant to pull over. The defendant disobeyed the order and continued driving. As he did, the officers observed him violate various vehicle and traffic laws, as well as discard a plastic bag out of the car window. A foot chase ensued, and the defendant was ultimately apprehended and arrested. As here, the bag that the defendant discarded was later discovered to contain narcotics. *Id*. at 564.

On these facts, the Second Circuit determined that reasonable suspicion to believe that the defendant was engaged in criminal activity, *see Terry v. Ohio*, 392 U.S. 1 (1968), was absent at the time the officers ordered the defendant to stop. *Id.* at 569-70. Because reasonable suspicion was wanting, had the officers' unreasonable order to stop actually resulted in the defendant's seizure, that seizure would have violated the Fourth Amendment. And, as the Second Circuit further reasoned in *Swindle*, events occurring thereafter could not have transformed that illegal stop and seizure into a legal one. *Id.* at 568.

In fact, however, the defendant in *Swindle* did not stop when the police issued the illegal order; rather, he ran – a fact that proved of constitutional significance to the court's decision. The defendant's flight, the court determined, brought *Swindle* within the ambit of the Supreme Court's holding in *California v. Hodari D.*, 499 U.S. 621 (1991), and dictated denial of the defendant's suppression motion. *Id.* at 572-73.

In *Hodari D.*, as in *Swindle*, the defendant fled as the police approached him, resulting in a chase by the officers. *California v. Hodari D.*, 499 U.S. at 622-23. One of the officers observed the defendant throw what appeared to be a small rock, which was later determined to be crack cocaine. The defendant thereafter moved to suppress the narcotics on the grounds that it was the fruit of an unlawful stop and seizure. Rejecting that contention, the Supreme Court held that the defendant had not been seized as contemplated by the Fourth Amendment. *Id.* at 629. Even assuming that the officer's pursuit constituted a "show of authority," the Court reasoned, "[a]ttempted seizures, of a person are beyond the scope of the Fourth Amendment." *Id*. at 625-26. A seizure requires "*either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *Id.* at 626 (emphasis in original). Because

the seizure did not occur until the defendant was physically apprehended – an act that occurred after the defendant discarded the narcotics –, the narcotics thus were not the fruit of a Fourth Amendment seizure and were properly admissible. *Id.* at 629.

Finding the Supreme Court's decision in *Hodari D.* to be controlling, the Second Circuit affirmed the denial of the defendant's suppression motion in *Swindle*. According to the court, it was constrained by the holding in *Hodari D.* to interpret the Fourth Amendment to require a showing of reasonable suspicion only "at the moment" the defendant was physically apprehended, "no matter how unreasonable the [prior] order to stop was." *Swindle*, 407 F.3d at 568.

Applying *Hodari D.* and *Swindle* to the facts of this case, I find that Gray, like the defendants in those cases, was not seized until he was actually apprehended by Munoz following the chase and his attempted abandonment of narcotics. He was neither physically restrained, nor did he submit to any show of authority until that time.[4] When he was apprehended, law enforcement plainly had reasonable suspicion to detain him, suspicion that ripened into probable cause for his arrest upon Vazquez's discovery, within a very brief time thereafter, of the bag of cocaine. His subsequent statements thus are not suppressible on the grounds that they are the fruit of an unconstitutional arrest.

---

[4] Indeed, to the best of Munoz's recollection, he did not activate his emergency lights or siren or verbally direct Gray to stop before Gray began to run. (Tr.C 12-13). If his recollection is accurate, Munoz's actions in initially approaching Gray would not have constituted an order to stop, however unreasonable such an order might have been.

9

II. **Alleged Violation of *Miranda***

Gray also moves to suppress the statements that he made in Vazquez's patrol car, as well as those he made during the interview at the Public Safety Building, on the grounds that he was not advised of his *Miranda* rights. (Docket # 20).

A. **Statements Made by Gray While in the Patrol Car:** According to the testimony before this Court, following Gray's apprehension, Munoz placed him in the rear seat of Vazquez's patrol car and requested that Vazquez drive to Gray's residence at 334 Durnan Street, where other officers were executing a search warrant. (Tr.A 8). Vazquez testified that he drove Gray to the area of 334 Durnan Street, parked across the street from Gray's residence and awaited further instruction. At some point during the approximately one hour wait, Vazquez questioned Gray concerning his pedigree information. (Tr.A 8-9, 15). During the wait, Gray apparently observed officers exiting 334 Durnan Street with a rifle and exclaimed, "Damn, I just fucked up my girl." (Tr.A 10). Gray further stated that he had found the rifle in the garbage bin and had taken it into the house in order to keep it away from children. (Tr.A 10).

According to Vazquez, Gray's statements were not made in response to any questions by him or any other officer. Moreover, no broadcasts had been received by Vazquez's police radio immediately preceding the statements and the windows in the patrol car were closed. (Tr.A 11-12). In other words, no dialogue between or statements of other officers could have elicited Gray's utterances. At no time did Vazquez advise Gray of his *Miranda* warnings. (Tr.A 20).

It is, of course, well-settled that statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to

10

*Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right. *Id.* at 444.

"'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Interrogation includes direct questioning, as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," *Innis*, 446 U.S. at 301, or that would "produce psychological pressures that [would] subject the individual to the 'will' of his examiner." *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (citations omitted). *See also United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992); *United States v. Thomas*, 961 F. Supp. 43, 44-45 (W.D.N.Y. 1997).

Generally excepted from the *Miranda* requirements under the "booking exception" is "[t]he solicitation of information concerning a person's identity and background." *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988) (citations omitted), *cert. denied*, 493 U.S. 956 (1989). *See Pennsylvania v. Muniz*, 496 U.S. 582, 600-02 (1990). Such statements are admissible "whether the solicitation occurs before . . . or after . . . *Miranda* warnings are given." *United States v. Adegbite*, 846 F.2d at 838 (citations omitted).

Another widely-recognized exception to the *Miranda* requirements relates to statements spontaneously made by a defendant. The Supreme Court has established that statements made by a defendant that are not elicited in response to interrogation do not violate

the Fifth Amendment. *See Rhode Island v. Innis*, 446 U.S. at 299-300. As the Court has reasoned:

> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated . . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda v. Arizona*, 384 U.S. at 478; *see also Rhode Island v. Innis*, 446 U.S. at 299-300; *United States v. Vasta*, 649 F. Supp. 974, 987 (S.D.N.Y. 1986).

Both *Miranda* exceptions are applicable in this case. As described above, Vazquez, while sitting in his patrol car, attempted to obtain Gray's biographical information by asking him for his name, date of birth, Social Security Number and address. (Tr.A 9, 15). Such questions were permissible under the pedigree exception and did not require a prior reading of the *Miranda* warnings. *See Pennsylvania v. Muniz*, 496 U.S. at 600-02; *United States v. Adegbite*, 846 F.2d at 838. Moreover, as Vazquez was waiting with Gray in his car, Gray exclaimed, "Damn, I just fucked up my girl," and offered an explanation for his possession of the gun. (Tr.A 10-11). I find that these statements, which occurred following Gray's observation of officers exiting his residence carrying a firearm, were not made in response to any inquiry by Vazquez, were completely spontaneous and did not violate Gray's Fifth Amendment rights. *See Miranda*, 384 U.S. at 478; *Rhode Island v. Innis*, 446 U.S. at 299-300. I therefore recommend that Gray's motion to suppress the statements made by him in Vazquez's patrol car be denied.

**B.  Statements Made by Gray at the Public Safety Building**:  The final statements Gray challenges are those he made to Sergeant McGrath at the Public Safety Building. The government opposes Gray's motion, arguing that his statements were made following a knowing and voluntary waiver of his *Miranda* rights.

As set forth above, the Supreme Court in *Miranda* held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant both was warned of his Fifth Amendment privilege against self-incrimination and voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  To establish a valid waiver, the government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."  *United States v. Jaswal*, 47 F.3d. 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

The record before this Court, including the testimony of Sergeant McGrath, demonstrates that Gray was advised of his *Miranda* rights and voluntarily agreed to waive them. Specifically, McGrath testified that upon entering the interview room, he introduced himself and asked Gray for his name, level of education and whether he could read and write.  (Tr.A 31-32). Gray responded that he had an eleventh grade education and that he could both read and write. After obtaining such information, McGrath advised Gray of his *Miranda* rights by reading the rights from a *Miranda* card "exactly the way they're printed on the card."  (Tr.A 32).  McGrath then asked Gray whether he understood his rights, and Gray replied, "Yeah, I understand

13

everything." (Tr.A 32). McGrath further asked Gray whether he was willing to speak with him, to which Gray responded, "Yes, I'll talk." (Tr.A 33).

McGrath thereafter questioned him about 334 Durnan Street, the rifle discovered at that location and his involvement with marijuana. (Tr.A 33). During the interrogation, Gray responded to questions posed to him and seemed, to McGrath, to be "fairly talkative." He did not appear intoxicated or under the influence of drugs, nor did he make any requests that were denied him. In addition, no threats or promises were made to Gray to induce him to speak. (Tr.A 37-38).

On this record, I find that Gray was advised of his *Miranda* rights and that he knowingly and voluntarily waived his those rights. Accordingly, this Court recommends that Gray's motion to suppress the statements he made to McGrath be denied.

## CONCLUSION

For the foregoing reasons, it is my report and recommendation that defendant's motions to suppress statements made on August 12, 2003 **(Docket # 20)** be **DENIED**.

**IT IS SO ORDERED.**

                                                  s/Marian W. Payson
                                                    MARIAN W. PAYSON
                                               United States Magistrate Judge

Dated: Rochester, New York
        June   9  , 2005.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

  **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

  **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

  The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

  The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

  Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                s/Marian W. Payson
                 MARIAN W. PAYSON
                United States Magistrate Judge

Dated: Rochester, New York
    June   9   , 2005.

---

[5] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).